DAVID C. HARDEE VS. WILLIAM P. CHEATHAM et al.

1. EXECUTOR: *Income.  Assets.  Investment.  Character of property.*
  Where the testator authorized his executor to cultivate a plantation for profit, and to invest the surplus income in property, with the consent of the probate court to the investment, and the executor pursued the directions of the will until a surplus income accumulated, with which he purchased lands, taking the deed in the names of the children of the testator, *Held*, that that part of the assets of the estate, upon the investment, became, and partook of the character of, real estate, and that thereafter the executor had only such power and control of it as he had over the real estate of which the testator died seized, and that it cannot be treated as personal assets for any purpose.

2. SAME: SAME: *Expenses incurred by executor.*
  The expenses incurred by an executor in cultivating a crop, or in other due course of his executorship, are not a charge upon the *corpus* of the estate.  His power to charge it with the expenses of cultivating a farm extends only to the income; for such expenses he may incur a personal liability, but has no power to bind the general assets, or to charge them with that character of indebtedness.

APPEAL from the Chancery Court of *Amite* County.

Hon. E. H. OSGOOD, Chancellor.

The opinion of the court contains a very full statement of all the material facts in the case.

It is assigned for error " that the chancery court erred in its final decree dismissing complainant's bill.   *   *   *   The final decree should have been in favor of complainant, granting the prayer of the bill."

*E. Safford*, for appellant:

Barney and Raiford claim two-thirds of the land, one-third conveyed by Christopher Cheatham, October 12, 1869, when Robinson was in possession of the land. The deed by which Cheatham's heirs derive title bears date December 16, 1858; and the purchasers from Christopher C. Cheatham were chargeable wit hnotice—constructive at least—of the contents of the deed, which may be briefly summarized thus : 1. That the consideration was paid by *Robinson as executor* of Thos. R. Cheatham, deceased. 2. It was to the grantees as heirs of Thos. R. Cheatham. 3. The land was subject to the control, etc., of the executor, under the will. The reference to the will is "presumptive" notice of its contents. Martin *v.* Nash, 31 Miss., 324; Parker *v.* Fry, 43 Miss., 266; Perkins *v.* Swank, 43 Miss., 360.

These purchasers were chargeable with notice, and with all the equities of Robinson, and took the conveyance subject to the same. As to the other third of the land, claimed by them under the judgment against William P. Cheatham, the consideration of their purchase at sheriff's sale was a *preëxisting debt*, and not money or other valuable thing paid at the time of the purchase, and this they took, also subject to all the equities of Robinson.

The judgment against William P. Cheatham was on attachment and sale made without giving the bond required by the Code, 1857, p. 379, art. 23.

*Harris & George*, for appellees :

This was a proceeding under the Code, 1857, p. 451, arts. 106, 107, as amended by act of 1862, p. 264.

The will shows a design to keep the estate together for accumulation. It was a large estate, consisting largely of slaves. The testator contemplated that the income alone should be consumed. No extraordinary powers are given to the executor except in item 17. He could not incumber the estate in any manner. In 1858 he had on hand money to buy the land, and did buy the land in controversy, and took control

and management of it, taking the deed to the heirs, all in, proper form.   He now asks to be relieved of this act because of unforeseen occurrences ; on account of the war the expense of managing the estate was so increased as to exceed the income, and this extraordinary expense was necessarily incur- red.   The will gives no power to change investments once made, or to sell property except crops.   Being designed to be permanent, the investment capitalized the income invested and put the property on the same footing with other property designed to be divided.   If its direction was fixed by the will the character of the investment could not be changed to suit subsequent action of the executor, so that it is to be capital to-day and income to-morrow.   *If any claim had attached to* it before the executor invested it, then, as to such claim, it might be treated as income ; but, clearly, it cannot be recon- verted by the fact that the executor miscalculated the results of the war coming on some years afterward.   We are borne out in our view by the late case of Moore *v.* Ware, 15 Miss., 206.   The expenses of administration of personalty are not a charge on the realty.

It was not his duty to carry on the business of the estate out of his own money.   It would not be pretended that he could borrow money for such a purpose.   By applying to the court he could have obtained power to sell property ; but, instead of this, he chose to lend money to the estate on the faith of the property which the war destroyed.

Errors in the performance of duties, honestly made, in good faith, may deserve indulgence ; but it was not the duty of the executor to lend money to the estate after it had ceased to pay expenses.   See 2 Williams' Ex'rs, 1626.

SIMRALL, C. J., delivered the opinion of the court.

David C. Hardee, assignee of Aaron Robinson, brought this suit in chancery to charge the lands in the pleadings mentioned with his debt.

In 1866 or 1867 Aaron Robinson, surviving executor of

Moses R. Cheatham, deceased, commenced proceedings in the probate court for a final settlement, which were continued from time to time until 1872, when a decree was passed allowing his accounts, and determining that there was a balance due the executor of $4,147.02, which was directed to stand as a charge upon the estate; this debt Robinson assigned to the complainant, Hardee.

This controversy depends very much upon the 17th item or clause of the testator's will. In substance it is as follows:

" That if, in the course of the management of the estate, there should be at any time funds in hand over and above what would be necessary to carry the will into effect, the executors were empowered to purchase property, real and personal, as they might deem best, * * * which property, when purchased, should become parcel of the estate, and divided according to the provisions of the will upon final settlement.''

It is important in this connection to bring into view the plan of the testator in respect of the management of his estate, and the disposition of it among the objects of his bounty.

The testator's family consisted of a wife and three sons—two of whom were minors—who were to enjoy his property.

The first injunction on the executors was to pay the debts as soon after the death of the testator as possible. He does not contemplate that it will be necessary to sell property for that purpose, for he next directs his executors to keep together (with some exceptions) his entire property until his youngest son, Christopher, attains majority or marries. He desired his son Moses, under contract with his executors, to superintend the business of his plantation, but when he retires from that employment, and " settles to himself," he is to take two slaves at a valuation. When his son William reaches majority, if Moses gives up, then he is to succeed him; and when he ceases to oversee he is to take off three slaves. A life estate is given to his widow in the home plantation; remainder to his

son Christopher.   Specific parcels of land are devised to Moses and William.   Taking the several parts of the will together, it is manifest that Moses and William could enter upon the enjoyment of the land severally devised to them, at their pleasure, after becoming of age.   The younger children were to be maintained and educated out of the bulk of the estate, which embraced the home plantation and slaves upon it. From the same source the widow was to be supported until a division of the personal estate was made, under the 10th item, at which time the portions given to the children were to be made equal, and any debts outstanding should be paid out of the personal estate.

It will now be distinctly perceived that the 17th clause of the will was intended to apply to such excess of income as the executors might have after discharging all the expenses which were chargeable on it, the character of which has been above disclosed.

Prior to 1858 we must suppose that all the debts had been paid, for in that year Robinson, the executor, suggested in writing to the probate court that he had over $2,000 surplus, and asked and obtained the consent of the court, as required by the will, to purchase the land in dispute at a specified price. The purchase was made and the deed taken directly to the children, the devisees; the *habendum* clause is "to have and hold the afore-granted premises, subject to the government, control, management, and possession of the executor,   *   *   *. pursuant and agreeable to the will of said testator," etc.   The bill alleges that after the purchase, and especially during the late war, the executor experienced great difficulty in carrying out the duties imposed by the will, owing to the fact that the estate consisted largely of slaves, and the condition of the country during the war rendered the estate unprofitable, and, in order to preserve the estate, the executor expended of his own means large sums, but that one result of the progress of the war was emancipation of the slaves, and that this fact rendered it impossible to procure reimbursements.

Barney and Raiford, two of the defendants, purchased, in 1868, an undivided one-third of the lands from Christopher, and, under judgment and execution against William, Barney purchased his undivided one-third in 1870.

At this sale notice was given of the claim of the executor on the land for any balance that might be due to him on final settlement.

Moreover these purchasers were chargeable with notice of the sort of estate which William and Moses had by the deed under which they acquired the title, which referred to the will of the testator.

It is pressed in argument for the appellant that the land ought, for the benefit of any balance due the executor, to be treated as personal assets, because of the conversion of money into the land. The doctrine of equitable conversions is founded on the principle that equity will regard a thing which ought to be done, or is directed to be done, to be actually done, as when, by will, marriage settlement, or otherwise, money is directed to be converted into land, or land into money. The court will regard the property as of that species into which it is ordered to be changed. Persons who claim property under such an instrument must take it in the character thus impressed upon it, and subsequent dispositions will be governed by the rules applicable to that species of property. Ackroyd *v.* Smithson, 1 Bro. C. C., 503; Craig *v.* Leslie, 3 Wheat., 577; 1 Lomax Ex., 220. The testator, Moses Cheatham, directed the conversion to be made. He left it to the judgment of the executor and of the probate court as to the sort of property. When the election was made, and the conversion was into lands, then the property from thenceforth partook of the characteristics of real estate, and must be governed in its devolution and disposition by the rules applicable to that species of property.

If the testator had given specific instructions to his executor to invest the surplus income in land, it would not be denied that he intended that the fund should lose its character and assume that of real estate.

Instead, however, of giving positive directions, the testator refers the matter to the judgment of the executor and of the probate court. When they make a selection of land as the species of property, the characteristics of that property adhere at once, and the fund has lost its original character.

The deed conforms to the testamentary purpose, as expressed in the 17th item. Mrs. Cheatham. was then dead, and the three sons, after her death, were the only persons to take interest in the lands. The land was procured from the general aggregate of property committed to the executor for support of the minors and widow, and for accumulation. Hence, although the title was placed in the three sons, the executor was to control and receive the income until he surrendered the estate to the children. The executor was to manage and make profit out of this land, as out of those of which the testator died seized, except the parcels devised to the two elder sons. The executor was to deal with the new purchase pre-cisely as with the home plantation, or any other lands owned by the testator and not specifically given to the elder sons.

We conclude, therefore, that the complainant has no larger or better equity against these lands than those which the testator owned at the time of his death.

The executor did his duty, and no more, in making the investment.

The extraordinary features of this will begin after the testator's debts are paid. That is enjoined to be done as soon as possible. When that has been accomplished, then the executor shall employ an overseer or manager, receive the crops, sell them, pay the expenses, and, when a surplus accrues, capitalize it. He has no power to borrow money, to mortgage, to sell, or to incur debts and subject anything more than the income. His unusual duties are limited to keeping the property together and disposing of its income.

An analysis of all the provisions of the will does not disclose a purpose to make the legacies and devises at all dependent on any act of the executor—such as imposing the incum-

brance of debt on the property itself. The design is manifest
that the *corpus* of the estate shall not be exposed to the haz-
ard of debts that the executor might contract.

Where the testator has been engaged in manufacturing, or
is a member of a partnership, and directs his executor to con-
tinue or carry on the business, it requires the most clear and
explicit words to confer power on the executor to charge the
general assets with debts incurred by him in the general course
of the business. It has been uniformly held, since the case of
*Ex parte* Garland, 10 Vesey, 110, that nothing more is involved
than the capital and effects embarked in it, and that the
general assets are not responsible for the debts incurred by
the executor. In Burwell *v.* Mandaville, Ex'r, 2 How.
(U. S.), 577, the court say that nothing but the most clear and
unambiguous language, demonstrating in the most positive
manner that the testator intends to make his general assets
liable in the continued trade after his death, will have that
effect. Persons who deal with an executor must know at their
peril the extent of his power. The executor carrying on the
trade or business may be personally liable, and may become a
bankrupt. *Ex parte* Richardson, 3 Madd., 138–157. See,
also, Cattush *v.* Cattush, 1 Barr, 184.

The principle of these authorities has been applied in several
cases, in our books, analogous to the one under consideration.
In Emanuel *v.* Norcum and Burwell, 7 How., 154, it was ruled
that an administrator who was "finishing a growing crop"
could not charge the expenses of it on the general assets; that
creditors to whom the administrator had become indebted on
that account were not creditors as against the general estate,
but as against the particular crop. The case of Hagan *v.*
Barksdale, 44 Miss., 196, was an effort on the part of mer-
chants, who had supplied the family and plantation at the
instance of the executors, to charge the debt upon the land.
The will was, "that my executors shall continue to cultivate
my lands with the negroes I now own, and the proceeds of
the crop, after paying all necessary expenses of the plantation,

and the clothing and education of my children, to be applied to the purchase of negroes and other property," etc.  The war had emancipated the slaves, and little or nothing was left except the land.

It was held that the crops were the means appointed by the testator to pay the complainants' debt, and that the executor could not incur debts on the credit of the lands.  In Ward *v.* Harrington, 29 Miss., 246, the will was like that in the case last cited, and the decision was that the will gave the executor no power to incumber the property left by the testator.  "Their power extends only to the income."

These principles were again applied in Farley et al. *v.* Hord, 45 Miss., 102, where the administrator was cultivating the plantation under license of the probate court, pursuant to § 96, p. 448, Code, 1857.  It was said that parties who deal with an administrator operating a farm under this statute are presumed "to understand that the administrator has no power to make their claim a charge upon the general assets."

In all these cases the result would have been the same if the executor or administrator had advanced the money.  He could only look to the fund under his control for reimbursement.  The general rule is that in each case the testator or the law has designated a special fund, and creditors will be confined to it.  2 Story Eq. Jur., § 1247.

These views dispose of the case without reference to the questions made as to the validity of the proceedings and decree of the probate court on final settlement.

Decree affirmed.